# EXHIBIT A

David L. Mortensen (#8242)
David.Mortensen@stoel.com
Jordan C. Bledsoe (#15545)
Jordan.Bledsoe@stoel.com
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131
Facsimile: (801) 578-6999

*Attorneys for Plaintiff Xat.com Limited*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| XAT.COM LIMITED,<br><br>    Plaintiff,<br><br>v.<br><br>HOSTING SERVICES, INC. A/K/A 100TB.COM,<br><br>    Defendant. | **FIRST AMENDED COMPLAINT**<br><br>Case No. 1:16-cv-00092<br><br>Chief Magistrate Judge Paul M. Warner |

Plaintiff Xat.com Limited ("Xat") alleges the following against Defendant Hosting Services, Inc., a/k/a 100TB.com ("100TB").

## PARTIES, JURISDICTION AND VENUE

1. Xat.com Limited is a private limited company incorporated in the United Kingdom that has its principal place of business in the United Kingdom.

2. Hosting Services, Inc. a/k/a 100TB is a Delaware corporation that has its principal place of business in Providence, Utah.

3. The amount in controversy in this case, exclusive of interest and costs, exceeds the sum of $75,000.

4. This Court has diversity jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332(a)(2).

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**Xat Retains 100TB to Host Its Servers**

6. Xat is a social networking website where users exchange instant messages. As of the fall of 2015, Xat's website had approximately 1 million unique visitors and up to 40,000 active users in any 24-hour period.

7. On October 13, 2008, Xat retained 100TB to host Xat's servers.

8. 100TB is a company that provides hosting services through a global

network of data centers.

9. 100TB represents to clients that its hosting services provide "the ultimate in hosting performance, reliability, and security."

10. 100TB specifically represents that its hosting services are protected by "rigorous security controls," and that protection of its clients' "sensitive information is at the center of [its] security efforts."

11. To use 100TB's services, Xat was required to upload its content to 100TB's servers, which created a copy on 100TB's system of Xat's content.

12. In uploading its content, Xat gave 100TB a license to "maintain" the copy and make it available to internet users.

**Xat and 100TB Enter Into an Agreement**

13. At the time Xat retained 100TB to host its servers, 100TB had a Master Service Agreement in place (the "2008 MSA"), which set out the rights, responsibilities, and obligations of the parties.

14. Xat was required to accept the 2008 MSA to use 100TB's services.

15. On information and belief, the 2008 MSA was not negotiated between the parties, and it was not executed with any signature from Xat. Nonetheless, Xat does not dispute the 2008 MSA was a valid and enforceable contract between the parties.

16. The 2008 MSA contained a provision stating, "Due to our evolving business, and the changing nature of the web hosting industry, these terms of service may change.  We will post the changes here, and your continued use of the service means you accept the changes we have made."

17. In 2014, 100TB amended the 2008 MSA (the "2014 MSA").  The terms of the 2014 MSA were not negotiated but were instead unilaterally drafted by 100TB.

**The Terms of the 2014 MSA**

18. The 2014 MSA includes express provisions related to security, confidentiality, and privacy.

19. For example, paragraph 13 of the 2014 MSA provides that 100TB "take[s] security seriously," and that 100TB "will use industry standard methods" to secure the services they provide.

20. Paragraph 13 also outlines steps that 100TB may take in the event of a security breach, such as notifying Xat in writing.

21. It further provides that each party agrees to "reasonably cooperate with each other" during an investigation of a security breach.

22. Paragraph 12 of the 2014 MSA provides that both parties agree to "keep certain information confidential."

23. Specifically, Paragraph 12 provides that "confidential information" included, but was not limited to, "a party's inventions, trade secret, Customer information, business plans, designs, programs, product or marketing data, Customer lists and histories, sources of supply, production plans, financial statements, pricing data, test results, business strategies, manuals, materials, systems, financial information, non-public methods, processes and techniques, [the 2014] MSA . . . , any information marked 'Confidential,' and all other non-public business and technical information, whether related to past, present or future products and services."

24. Paragraph 12 also provides that each party agrees to hold the confidential information in confidence with "the same care and protection as it gives generally to its own confidential and proprietary information, but no less than reasonable care," and that each party agrees to do so "to avoid disclosure to, or unauthorized use by, any third party."

25. The 2014 MSA incorporates by reference 100TB's Privacy Policy.

26. In its Privacy Policy, 100TB represents that it "complies with the U.S. - EU Safe Harbor Framework and the U.S. - Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce." It also certifies "that it adheres to both safe Harbor Privacy Principles' respective provisions addressing notice,

choice, onward transfer, security, data integrity, access and enforcement."

27. Under the Safe Harbor Privacy Principles, "Organizations creating, maintaining, using or disseminating personal information must take reasonable precautions to protect it from loss, misuse and unauthorized access, disclosure, alteration and destruction."

28. In its Privacy Policy, 100TB represents that when individuals contact 100TB for support for their services, they will be asked to match certain information that is in their registration information.

29. Pursuant to the 2008 and 2014 MSAs, and in exchange for its use of 100TB's services, Xat was required to make monthly payments. As of January 1, 2016, Xat was current on its payment obligations.

30. Paragraph 7 of the 2014 MSA establishes a mechanism for termination of the MSA. As of January 1, 2016, neither party had terminated the MSA.

31. Under Paragraph 9 of the 2014 MSA, 100TB agreed to indemnify and hold Xat harmless from any and all third party actions, liability, damages, and costs and expenses, including attorneys' fees, arising from, or relating to, personal injury or property damage resulting from 100TB's gross negligence or willful misconduct.

**100TB Allows Individuals to Access Xat's Account and Servers Through Social Engineering**

32. On January 8, 2015, Xat warned 100TB that a third party had requested that 100TB reset the password to Xat's servers and that the third party appeared to be using "social engineering"[1] to con 100TB employees into changing the password to Xat's servers.

33. 100TB responded to Xat's warning by representing to Xat that its password had not been reset.

34. Between January 14 and September 15, 2015, Xat received six notices from 100TB that 100TB had received requests to reset Xat's password to its control panel. Xat communicated with 100TB regarding each of the unauthorized password reset requests, telling 100TB that they did not request any password resets.

35. On February 22, 2015, a third party attempted to access Xat's servers through various means, including social engineering of 100TB's chat support group, and sending multiple "spoofed" emails to 100TB requesting that 100TB change the password to Xat's servers.

---

[1] "Social engineering" is an attack vector that relies heavily on human interaction and often involves tricking people into breaking normal procedures (e.g., obtaining the personal information of another person by intentionally misrepresenting a past or exiting fact).

36. On February 22, 2015, Xat informed 100TB that the spoofed emails were not sent by Xat and asked 100TB to confirm that 100TB would not act on any of the fraudulent requests for 100TB to change the password to Xat's servers.

37. On February 22, 2015, in spite of Xat's warnings and requests, 100TB changed the password for one of Xat's servers to a password provided by the third party.

38. On February 23, 2015, Xat requested that 100TB investigate the security lapse of the prior day and that it involve its senior management in the matter to ensure it never happened again.

**Xat Implements Additional Security Measures to Protect Its Account and Servers**

39. Between February 24 and March 11, 2015, 100TB requested that Xat implement an email-validation system on its email software called "Sender Policy Framework" ("SPF") on the assumption that Xat's email had been compromised.

40. Xat complied with 100TB's request by implementing SPF on its email, but informed 100TB that Xat's email had not been compromised and that adopting SPF would not prevent the types of attacks that had targeted its servers. Xat warned 100TB that the attacks targeted 100TB's systems and operations, not Xat's email system.

41. Between March 15 and September 16, 2015, a third party contacted 100TB on multiple occasions requesting that 100TB alter the password to Xat's servers or add email addresses to Xat's account.

42. Each time that 100TB informed Xat that someone had requested a change to its servers' password, Xat warned 100TB that it did not make the request and that the request was instead an attempt to obtain unauthorized access—to hack—into Xat's servers.

43. On September 16, 2015, 100TB confirmed to Xat that all of the third-party attempts to access Xat's account were logged and retained in case that information was necessary for a subsequent investigation.

44. In the fall of 2015, 100TB offered "two-factor authentication"—a service whereby customers like Xat could enable a security measure that required two components (such as a password and a computer-generated personal identification number) to access their accounts.

45. On September 8, 2015, Xat enabled two-factor authentication for access to the control panels of its servers with 100TB.

**100TB Again Allows Individuals to Access Xat's Servers and Account Through Social Engineering**

46. On November 4, 2015, at a third party's request, 100TB added an unauthorized email address to Xat's account, turned off two-factor authentication

on Xat's account, and gave the third-party control over Xat's servers (the "First Cyberattack").

47. During the First Cyberattack, the attacker(s) damaged one of Xat's servers, stole proprietary software, and wiped the server so that Xat was unable to recover data from it.

48. In response to the First Cyberattack, Xat requested that 100TB shut and lock down its servers until Xat could receive assurances that the First Cyberattack had been contained.

49. In response to the First Cyberattack, Xat requested that 100TB back-up the servers to prevent loss of data in any future attack and that it verify that its servers were secured.

50. Following the First Cyberattack, Xat warned 100TB that the attackers were still trying to access Xat's servers and asked that 100TB confirm that the servers were locked down.

51. On information and belief, 100TB did not power-down at least three of Xat's servers after the First Cyberattack, did not turn on two-factor authentication, and did not otherwise take steps to preserve the integrity of Xat servers.

52. On November 7, 2015, a third party gained root access to Xat's main

server through 100TB (the "Second Cyberattack").

53. On information and belief, the third party gained access to Xat's server during the Second Cyberattack through social engineering.

54. On information and belief, during the Second Cyberattack, the third-party accessed Xat's proprietary log files, databases and source code, and erased system log files from Xat's server.

**Xat Incurs Significant Damages as a Result of the Cyberattacks**

55. As a result of the First and Second Cyberattacks (the "Cyberattacks"), Xat has incurred damages in excess of at least $500,000, including but not limited to the following:

    a. The costs of containing the Cyberattacks;

    b. The value of data deleted, lost, or stolen by a third party;

    c. Costs associated with reporting the Cyberattack to the appropriate authorities, including law enforcement and the United Kingdom's Information Commissioner's Office;

    d. Lost revenue and profit as a result of shutting down Xat's website from November 4-19, 2015, while Xat addressed the Cyberattacks;

  e. Reputational harm to Xat;

  f. Costs of rebuilding Xat's website after the Cyberattacks; and

  g. Legal costs and attorneys' fees.

**FIRST CAUSE OF ACTION**
**(Breach of Contract)**

56. Xat incorporates all other paragraphs of this Complaint.

57. At the time Xat retained 100TB to host its servers, the 2008 MSA governed the parties' relationship and set out the rights, responsibilities, and obligations of the parties. The 2008 MSA was a valid and enforceable contract.

58. Xat performed its obligations under the terms of the 2008 MSA by, among other things, making all payments due under the 2008 MSA prior to the Cyberattacks.

59. 100TB amended the 2008 MSA with the 2014 MSA. Xat performed its obligations under the terms of that agreement by making all payments due under the 2014 MSA prior to the Cyberattacks.

60. 100TB breached the express provisions in the 2014 MSA, as described above, governing security, privacy, and confidentiality when it failed to follow industry-standard security methods to prevent a security breach of Xat's content and servers; failed to adhere to the privacy policy requirements, including matching registration information before making changes to Xat's account; and failed to take reasonable steps to prevent disclosure of Xat's confidential information.

61. As a result of 100TB's breach, a third party was allowed to gain

access to Xat's content and thereafter steal proprietary information, wipe Xat's servers, and otherwise damage Xat's content and data.

62. Due to 100TB's breach, Xat has sustained damages, including those described above, and any claims asserted by its customers and/or regulatory authorities against Xat as a result of the Cyberattacks.

63. Pursuant to Paragraph 9 of the 2014 MSA, and to the extent the 2014 MSA governed the parties' relationship at the time of the Cyberattacks, Xat is entitled to indemnity from 100TB for any claims or expenses, including costs and attorneys' fees, incurred in defending any claims asserted against Xat, as a result of the Cyberattacks.

## SECOND CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

64. Xat incorporates all other paragraphs of this Complaint.

65. The 2014 MSA was subject to an implied covenant of good faith and fair dealing.

66. Under Utah law, there is a covenant of good faith and fair dealing implied in the parties' agreement whereby 100TB covenanted that it would not do anything that would have the effect of destroying or injuring Xat's rights to receive the benefits of the 2014 MSA.

67. 100TB had an implied duty under the 2014 MSA to safeguard Xat's content and servers.

68. The implied promise to safeguard Xat's content and servers arose from the overall spirit and purpose of the 2014 MSA as well as through its course of dealings with Xat.

69. Safeguarding Xat's content and servers was an important component of 100TB's hosting service, and represented a common, agreed purpose between the parties.

70. As a result, Xat held a justified expectation that 100TB would host its content and servers in a safe, secure manner.

71. 100TB breached the implied covenant by intentionally or purposefully defeating Xat's justified expectation of security when it facilitated and allowed a third party, through social engineering, to access its content and servers.

72. Had 100TB informed Xat that it would not promise to host its content and servers in a safe, secure manner, Xat would not have retained 100TB's services. As a result of 100TB's breach of the implied duty, Xat sustained damages, including those described above.

## THIRD CAUSE OF ACTION
### (Equitable Indemnification)

73. Xat incorporates all other paragraphs of this Complaint.

74. Xat has incurred significant costs to remedy and avert any harm to its customers or any third-party whose information may have been exposed during the

Cyberattacks, including costs of cooperating with the appropriate authorities and governmental agencies investigating the Cyberattacks.

75. 100TB is liable to any third-party whose information may have been exposed during the Cyberattacks.

76. Xat is entitled to be equitably indemnified by 100TB for all costs, including attorneys' fees, incurred as a result of any claims asserted by any third-party whose information was or may have been exposed during the Cyberattacks, and for any costs incurred in responding to the Cyberattacks or cooperating with the authorities and governmental agencies investigating the Cyberattacks.

## PRAYER FOR RELIEF

WHEREFORE, Xat demands that judgment be entered against 100TB as follows:

1. Judgment in an amount to be proven at trial, inclusive of general and special damages, including (a) lost profits, (b) lost business opportunities, (c) damages for harm to Xat's business reputation, (d) lost operating revenue for the dates Xat had to shut-down its servers to address the Cyberattack, (e) compensation for the cost and time spent addressing the Cyberattack, and (f) any penalties assessed against Xat as a result of the Cyberattack.

2. An order requiring 100TB to indemnify Xat for any claims related to

the Cyberattacks asserted by any third party, including any claims asserted by any regulatory authority or any individual or entity whose information was or may have been exposed during the Cyberattacks, and for any costs and attorneys' fees incurred by Xat related to any of the foregoing; and

    3.    Xat's reasonable experts' and attorneys' fees and other costs and expenses incurred in this civil action or as a result of the Cyberattack.

DATED: October ___, 2018

        STOEL RIVES LLP

        /s/ *David L. Mortensen*
        David L. Mortensen
        Jordan C. Bledsoe

        *Attorneys for Plaintiff Xat.com Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on October __, 2018, I caused a true and correct copy of the foregoing to be served by CM/ECF and electronic mail to:

Patricia W. Christensen
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
pchristensen@parrbrown.com

David M. McMillan
Paul G. Karlsgodt
BAKER & HOSTETLER LLP
1801 California Street
Denver, Co 80202
dmcmillan@bakerlaw.com
pkarlsgodt@bakerlaw.com

/s/ *Robin Noss*